# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>249 NORTH DELMAR AVENUE<br>DAYTON, OHIO 45403<br>INCLUDING ALL OUTBUILDINGS AND CURTILAGE | )<br>)<br>) Case No. 3:22MJ073<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the Southern District of Ohio, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute controlled substances |
| 18 U.S.C. §§ 922(g)(1) & 924(a)(2) | Felon in possession of a firearm |

The application is based on these facts:

SEE AFFIDAVIT IN SUPPORT

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

TFO DUSTIN J. PHILLIPS, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Facetime *(specify reliable electronic means)*.

Date: 02/23/2022

*Judge's signature*

City and state: DAYTON, OHIO — SHARON L. OVINGTON U.S. MAGISTRATE JUDGE
*Printed name and title*

# ATTACHMENT A

**Location 1:** The place to be searched is 249 North Delmar Avenue, Dayton, Ohio 45403 and the surrounding curtilage. 249 North Delmar Avenue, Dayton, Ohio is a one-story white, single family home with a black front door and glass screen door. 249 North Delmar Avenue is located on the west side of North Delmar Avenue. 249 North Delmar Avenue, Dayton, Ohio 45403 is further depicted in the following photograph.



R72 04810 0157  04/03/2013

## ATTACHMENT B

## PROPERTY TO BE SEIZED

The items to be searched for and seized are evidence, contraband, fruits of crime, and other items illegally possessed, as well as property designed for use, intended for use, relating to violations of 21 U.S.C. §§ 841(a)(1) and 18 U.S.C. §§ 922 including, but not limited to:

A. Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B. Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C. Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D. Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E. Electronic equipment such as surveillance video and related equipment, pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios, money counters.

F. United States currency, precious metals, coins, bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H. Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

I. Illegal drugs, including but not limited to methamphetamine, and other materials, paraphernalia and/or equipment and tools used in the drug trade.

J. Firearms and ammunition.

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Dustin J. Phillips, a Task Force Officer ("TFO") for both the Federal Bureau of Investigation ("FBI") and City of Dayton Police Department ("DPD"), hereby duly sworn, declare and state:

## INTRODUCTION

1. I have been employed as a law enforcement officer for the past fourteen (14) years. I currently serve as a detective with the DPD. I am presently a TFO with the FBI Dayton Resident Office's Safe Streets Task Force (SSTF). As such, I have been sworn under the Title 21, United States Code ("U.S.C."), Section 878, to serve as an officer of the United States duly empowered to conduct federal criminal investigations and execute arrests for criminal violations of Titles 18 and 21 of the U.S.C.

2. I am also a TFO with the DPD's Major Case/Drug Enforcement Unit within the Narcotic's Bureau. Since 2013, in my roles with SSTF and DPD, I have almost exclusively concentrated on the investigation of: narcotics, firearms, and gang-related criminal cases. During my law enforcement career, I have been involved in a large number of firearm-related arrests, executions of search warrants resulting in the seizure of large quantities of narcotics and firearms, participated in undercover narcotics purchases, and supervised the activities of police informants who have provided law enforcement authorities valuable and accurate information and assistance that ultimately resulted in undercover narcotics purchases and apprehensions. I have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions. Based on my training and experience – including my participation in the investigations referenced above – as well as discussions and interactions with other experienced FBI SA's, Task Force Officers ("TFO"), and narcotics investigators, I am familiar with the manner in which drug traffickers and

their organizations operate within the United States. Based on my aforementioned training and experience, I am familiar with the modus operandi of persons involved in the illicit distribution of controlled substances and as a result, knows the following:

a. It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and beeper/pager services by using other person's names in order to avoid detection by law enforcement officials.

b. It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

c. That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

d. It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

e. It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business.

f. It is common practice that drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them.

g. It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

h. That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

i. When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's

        checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.

j.      Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.

k.      It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list.

l.      Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers.  Photographs such as these can commonly be found and stored in cellular phones.

m.      Drug traffickers commonly have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n.      Drug traffickers frequently maintain hidden compartments within their residence and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o.      The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone.  These details are usually agreed upon during face-to-face transactions.  For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another.  When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers.  The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor.  After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors.  The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates.  Most of the drugs, as well as diluting and packaging materials and weighing equipment, are

      usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

p.    Drug traffickers frequently use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

q.    Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

r.    I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away.

## PURPOSE OF AFFIDAVIT

3.    I make this affidavit in support of an application for a search warrant at the following residence – namely:

    a.    249 North Delmar Avenue, Dayton, Ohio 45403, including any outbuildings, basements, garages, or sheds located on its curtilage (hereinafter "**Location 1**"). **Location 1** is described more fully in Attachment A, which is incorporated herein by reference;

4.    As detailed more fully below, I submit that there is probable cause to believe that evidence of a crime as well as contraband, fruits of a crime or other items illegally possessed in relation to the following offenses exist and can be found inside **Location 1 – namely:**

    a.    Possession with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 841; and

4

        b.        Being a Felon in Possession of a Firearm and Ammunition, in violation of 18 United States Code § 922.

    5.        A list of specific items to be seized from the premises described above is attached hereto as Attachment B, and Attachment B is incorporated herein by reference.  Based on my training and experience as well as the facts contained in the affidavit, I believe that there is probable cause to believe that the items listed in Attachment B will be found at the premises described above.  I have not included every detail of the investigation, but only information necessary to establish probable cause that evidence associated with above-described drug trafficking offenses is located at **Location 1**.

## PROBABLE CAUSE

    6.        On February 10, 2022, a federal arrest warrant was signed by the Honorable United States Magistrate Judge Peter B. Silvain Jr., charging Stephen Duane Brown with two counts of Being a Felon in Possession of a Firearm. This was part of an ongoing investigation into Brown that I had been conducting for several months. As part of this investigation, intelligence was obtained that Brown is residing at **Location 1**. Prior to the arrest warrant being signed, I observed Brown at **Location 1** on two separate occasions. Since the warrant has been signed, I have observed Brown at **Location 1** on several additional occasions, leading me to believe this is his primary residence. During this surveillance, I observed a black 2016 Chevy Malibu parked at the house bearing a "SVG" dealer license plate. I have seen Brown arrive and leave in this vehicle on several instances.

    7.        On February 17, 2022, I performed a trash pull at 249 **Location 1**. The trash can was out for city removal and was placed on the curb in front of the house to be picked up. The black 2016 Chevy Malibu was at the house earlier and left just before the trash pull was performed.

I inspected several trash bags from inside the trash can for evidence. Inside the trash bags, I located four (4) empty sandwich baggies, each of which contained a small amount of marijuana residue. Additionally, I located mail addressed to Brown at **Location 1**. Photographs were taken of all the bags recovered as well as the possessory paperwork and they were tagged into the Dayton Police Property Room as evidence.

8. On February 23, 2022, members of the FBI Special Weapons and Tactics (SWAT) Team executed an operation to arrest Brown from **Location 1**. The same black Chevy Malibu was present at the house prior to the SWAT seam arriving. As they arrived, they surrounded the house and began giving verbal announcements via the loud speaker from the tactical vehicles, ordering Brown to exit the house. After a short period of time with no response, SWAT breached the front door of the house. A female (hereinafter referred to as M.B.) came to the front door and exited the house. At this time, members of the SWAT team deployed electronic surveillance equipment inside the house and located a male, later identified as Brown, coming from the bedroom, going into the kitchen. Brown was wearing a large puffy coat and had both hands in his pockets as he walked through the living room into the kitchen. Brown then went to the side door of the house, which is also in the kitchen, and after seeing additional SWAT personnel outside this door, retreated back into the house. During this time, he could be seen via electronic surveillance, putting his hands in and out of his jacket pockets while in the kitchen, and appeared to be either concealing or discarding one or more objects. After several additional announcements, Brown eventually exited the front door and was taken into custody. He was placed in a marked cruiser at that time. The SWAT Team quickly handcuffed the male and passed him off to the marked transport cruiser due to the house not being secured yet.

9. After placing Brown in the cruiser, two small children, one approximately seven years old, who was carrying the second child, approximately 3 years old, exited the house. They were escorted to a cruiser and placed with M.B. The SWAT Team then entered the house to ensure there were no other children left unattended, additional people present, and to secure the house since the front door had been breached.

10. No other people were located inside, however several items of evidentiary value were located lying in plain view. In the kitchen area, SWAT members observed a small baggie of a clear chunky material which appeared to be methamphetamine. There were also two small baggies of marijuana on the kitchen counter. All three of these items could be seen without moving or manipulating any other items in the kitchen. All three of these items were in the same area where Brown was seen as he was moving around inside the house. The SWAT Team called me to the house to show me the suspected contraband that had been located.

11. I observed the baggie of suspected methamphetamine sitting on the stove. From my training and experience as a narcotics detective, this amount appeared to be more than a user amount and would equate to a distribution quantity.

12. After seeing the baggies of suspected narcotics, I went to the cruiser and spoke with the male that was taken into custody. As I opened the back door of the cruiser, I was able to confirm that this was in fact Brown. I advised him of his *Miranda* warnings and he agreed to speak to me without a lawyer present at that time. I informed him of his charges and that some suspected narcotics had been located inside the house. I told him I intended on searching the house and asked for consent, to which he ultimately denied. Brown was then transported and booked into the Montgomery County Jail without further incident.

## CONCLUSION

13. Based on the facts set forth in the Affidavit, I believe there is probable cause that evidence associated with the above listed drug trafficking offenses are located within the residences and surrounding curtilage of **Location 1**.

_____
Dustin J. Phillips
Task Force Officer
Federal Bureau of Investigation

Sworn and subscribed before me via telephone on this __23rd__ day of February, 2022.

_____
SHARON L. OVINGTON
UNITED STATES MAGISTRATE JUDGE

Sharon L. Ovington
United States Magistrate Judge